UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LARGAN PRECISION CO., LTD,

Plaintiff,

v.

MOTOROLA MOBILITY LLC.,

Defendant.

Case No. 21-cv-09138-JSW

**CLAIM CONSTRUCTION ORDER**

The Court has been presented with a technology tutorial and briefing leading up to a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). This Order construes the disputed claim terms selected by the parties, which appear in United States Patent No. 8,310,767 ("the '767 Patent") and U.S Patent No. 9,784,948 ("the '948 Patent") (collectively, the "Asserted Patents").

**BACKGROUND**

Plaintiff Largan Precision Co., Ltd. ("Largan") filed this suit against Defendant Motorola Mobility LLC ("Motorola") on November 24, 2021. (Dkt. No. 1.)  In the Complaint, Largan asserted infringement of the '767 Patent, the '948 Patent, as well as United States Patent Nos. 8,514,499, 9,696,519, 10,209,487, and 10,564,397.  (*Id.*)  Largan filed an amended complaint on February 23, 2022. (Dkt. No. 36.)  Motorola answered the amended complaint on March 9, 2022. (Dkt. No. 45.)  Motorola also filed six petitions to the United States Patent Trial and Appeal Board ("PTAB") for inter partes review ("IPR") of those patents.  (*See* Dkt. No. 68.)  This case was then stayed pending IPR until May 16, 2023, at which point the Court lifted the stay after Largan agreed to narrow its Asserted Claims to claims 16–20 and 22–24 of the '767 Patent, which survived IPR with no appeal permitted, and claim 5 of the '948 Patent, which was not challenged

United States District Court
Northern District of California

on IPR. (Dkt. No. 82.)  Accordingly, Largan now asserts infringement of claims 16–20 and 22–24 of the '767 Patent and claim 5 of the '948 Patent.

The Asserted Patents are generally directed to imaging systems which comprise multiple lens elements.  As an example, Fig. 1A of the '767 Patent shows the cross section of an imaging system comprising six lens elements:



Fig. 1A

('767 Patent Fig. 1A.)

Industry convention dictates that in depictions such as Fig. 1A, light rays travel from an object being imaged on the left, through the lens elements in the imaging system, to generate an image on a sensor to the right.  Accordingly, the left surface of any lens element is described as the "object side surface" of the element, and the right surface is the "image side surface."   Each lens element thus has an object-side surface and an image-side surface.  The line passing through the center of each lens element (represented in Fig. 1A as 111) is the "optical axis", and the lens elements are symmetrical around the optical axis.  The surfaces of lens elements may be many shapes. A flat surface is described as a "planar" surface.  A surface that curves inward is described

as "concave" and  a surface that curves outward is "convex."[1]  A lens surface may be entirely planar, convex, or concave, or contain portions that are planar, convex, and/or concave.  The point at which a portion of the lens changes from being one shape (e.g., planar, convex, or concave) to another is described as an "inflection point."  A "spheric" lens is a lens that can be described as a cross-section of a sphere; conversely, "aspheric" describes lenses that are non-spherical.  Lens manufacturers also describe lenses with more specific details, such as radius of curvature, thickness, index of refraction, Abbe number, focal length, aperture stop, and for aspheric surfaces, the aspheric coefficients.  (*See* Dkt. No. 105-4 ("Bentley Decl.") ¶¶ 21–33; Dkt. No. 106-4 ("Barbastathis Decl.") at 5–6; Dkt. No. 105 ("Largan Br.") at 3–5; Dkt. No. 106 ("Motorola Br.") at 2–4.)

The '767 Patent is entitled "Image Capturing Lens Assembly,"  and generally relates to imaging lenses with six lens elements.  Independent claim 16, upon which all the asserted claims of the '767 Patent depend, recites:

> 16. An image capturing lens assembly comprising, in order from an object side to an image side:
>
> a first lens element with positive refractive power having a convex object-side surface;
>
> a second lens element with negative refractive power;
>
> a third lens element;
>
> a fourth lens element having at least one of an object-side surface and an image-side surface thereof being aspheric;
>
> a fifth lens element with positive refractive power having a convex image-side surface, and at least one of an object-side surface and the image-side surface thereof being aspheric; and
>
> a sixth lens element with negative refractive power having a concave image-side surface, and at least one inflection point is formed on at least one of an object-side surface and the image-side surface thereof;
>
> wherein a focal length of the fifth lens element is f5, a focal length of the sixth lens element is f6, a focal length of the third lens element is

---

[1] The Court summarizes what the parties agree is the industry convention for these terms.  The parties dispute whether, in the specific context of the Asserted Patents, these terms mean different things, which the Court addresses in Section C(1), *infra*.

United States District Court
Northern District of California

f3, a focal length of the fourth lens element is f4, and they satisfy the following relation:

$(|f5|+|f6|)/(|f3|+|f4|)<0.4.$

('767 Patent cl. 16.)  Claims 17–20 and 22–24 recite systems wherein certain lens elements have varying focal lengths, surface concavity/convexity, and thicknesses.  (*See id.* cls. 17–20, 22–24.)

The '948 Patent is entitled "Imaging Lens System," and generally relates to imaging lenses with five lens elements.  Claims 1 and 4 of the '948 Patent, upon which asserted claim 5 depends, recites:

> 1. An imaging lens system including, in order from an object side to an image side:
>
> a first lens element having a concave image-side surface;
>
> a second lens element;
>
> a third lens element with negative refractive power having a convex object-side surface and a concave image-side surface, the object-side and image-side surfaces thereof being aspheric;
>
> a fourth lens element with positive refractive power having a convex image-side surface; and
>
> a fifth lens element with negative refractive power having a convex object-side surface and a concave image-side surface, the object-side and image-side surfaces thereof being aspheric, each of the object-side and image-side surfaces thereof being provided with at least one inflection point;
>
> wherein there are a total of five lens elements in the imaging lens system, and a gap exists between every two adjacent lens elements along an optical axis of the imaging lens system.
>
> . . .
>
> 4. The imaging lens system according to claim 1, wherein the first lens element has positive refractive power.

('948 Patent cls. 1, 4.)  Claim 5 then recites: "The imaging lens system according to claim 4, wherein the second lens element has negative refractive power."  (*Id.* cl. 5.)

## ANALYSIS

### A.    Legal Standard

Claim construction is a question of law for the Court.  *Markman*, 517 U.S. at 384. It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the

United States District Court
Northern District of California

patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). The Court has an obligation to assign "a fixed, unambiguous, legally operative meaning to the claim" in order to "ensure that questions of the scope of the patent claims are not left to the jury." *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) (quotation omitted).

Claim terms are generally given "their ordinary and customary meaning"—i.e., "the meaning that the terms would have to a person of ordinary skill in the art at the time of the invention." *Phillips*, 415 F.3d at 1312–13. There are only two exceptions to this rule: (1) "when a patentee sets out a definition and acts as his own lexicographer," and (2) "when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). A patentee seeking to be its own lexicographer "must clearly express that intent in the written description" with "sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). This intent need not be expressed as a formal redefinition, as the "specification may define terms 'by implication' such that the meaning may be found in or ascertained by a reading of the patent documents." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (internal quotation omitted). However, "[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term." *Thorner*, 669 F.3d at 1365. However, "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Bell Atl.*, 262 F.3d at 1271; *see also In re Abbott Diabetes Care Inc. ("Abbott")*, 696 F.3d 1142, 1150 (Fed. Cir. 2012) (claim term may be defined by implication where patents "repeatedly, consistently, and exclusively" depict embodiments using that definition).

In determining the ordinary and customary meaning, the claim language "provide[s]

substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Additionally, "the context in which a claim term is used in the asserted claim can be highly instructive." *Id*.  However, a person of ordinary skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313. The specification "is always highly relevant to the claim construction analysis" and is usually "dispositive." *Id*. at 1315. The scope of the claims must be "determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Id*. at 1316 (quoting *Renishaw PLC v. Marposs Soceta' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Thus, the construction that "stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id*.

In addition to the claims and the specification, the prosecution history may be used "to provide[ ] evidence of how the PTO and the inventor understood the patent." *Id*. at 1317.  "[A]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described and patented."  *Fenner Inv., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015).  The claims, specification, and prosecution history together constitute the "intrinsic evidence" that forms the primary basis for claim construction.  *Phillips*, 415 F.3d at 1312-17 (citation omitted).  Courts may also consider extrinsic evidence if it is "helpful in determining the 'true meaning of language used in the patent claims' " and is not contradicted by the intrinsic evidence.  *Id*. at 1318 (*quoting Markman*, 52 F.3d at 980).

## B.    Person of Skill in the Art (POSITA)

The parties agree that a person of skill in the art, in the context of the Asserted Patents, "would have had a bachelor's degree in physics or optics, and at least three years of experience in the field of optical design, or its equivalent experience." (Bentley Decl. ¶ 88; *see also* Dkt. No. 105-7 ("Shanley Decl.") at 4.)

C.     **Construction of Disputed Terms**

1.     **"convex . . . surface" / "concave . . . surface" (Asserted Patents, all claims)**

| Largan's Proposed Construction | Motorola's Proposed Construction |
| --- | --- |
| "surface that is convex/concave where the surface intersects the optical axis" | Indefinite |

The term "convex . . . surface" and "concave . . . surface" appears in independent claims 1 and 16 of the '767 Patent and independent claims 1, 14 and 23 of the '948 Patent.  The claims recite lens imaging systems that contain lens elements with "convex" and "concave" "image-side surface[s]" and "object-side surface[s]."  (*See* '767 Patent cls. 1, 16; '948 Patent cls. 1, 14, 23.) Largan argues that a POSITA would understand the terms to mean a "surface that is concave / convex where the surface intersects the optical axis" because the intrinsic and extrinsic evidence specifies that convexity and concavity is measured at the optical axis.  (*See* Largan Br. at 6–8.) Motorola argues that the terms are indefinite, because the patentee acted as its own lexicographer by defining the terms to mean that convexity and concavity are measured at the region "in proximity to" or "proximate to" the optical axis.  (*See* Motorola Br. at 7–9.)  Motorola then argues that these lexicographical definitions are indefinite because "the asserted patents provide no guidance as to the bounds of the term, leaving a POSITA with no way to determine with reasonable certainty that a particular lens is within or outside the scope of the claims."  (*See id.* at 9.)

As the party arguing for indefiniteness, Motorola bears the burden to prove by clear and convincing evidence that the terms have no ascertainable meaning, such that the claims in question "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  The Court finds that Motorola has failed to meet that high burden here.  Motorola's argument is two-fold: first, that the Asserted Patents set forth a special lexicographical definition in which convexity and concavity are measured at the region "in proximity to" or "proximate to" the optical axis, and that second, the Asserted Patents provide no guidance as to where this boundary should be measured at.

However, even assuming, *arguendo*, that Motorola is correct that the Asserted Patents set forth a clear lexicographical definition, the Court finds that that definition would still be consistent with Largan's proposed construction.

According to Motorola's first claim construction expert Dr. Barbastathis, as a general matter, "[i]f an object is characterized as 'convex,' then it would be understood to be wholly convex, *i.e.* its surface would be convex everywhere; and similarly for concave." (Barbastathis Decl. at 6.)  He continues that "[i]t is also certainly possible for the curvature of a surface to switch from convex to concave at certain locations. One would then refer to the respective *portions* of the object or its surfaces as convex or concave." (*Id.*)  Motorola's current claim construction expert, Dr. Shanley, expressly agrees with Dr. Barbastathis's opinion here. (Shanley Decl. at 4.)[2]  From these statements, it follows that if a *portion* of a surface is characterized as "convex", it would be understood that portion would be wholly convex—i.e., convex at every point within that portion—and similarly for concave.

Furthermore, the Asserted Patents define convexity and concavity of a surface with respect to "*the* portion of the surface [in proximity to / proximate to] to the optical axis," implying there can only be one such portion of the surface.  Logically, this means that *the* portion of the surface that is "in proximity to" or "proximate to" the optical axis must include the optical axis.  Motorola, relying on Dr. Shanley, argues that the Asserted Patents "giv[e] a POSITA no definite guidance as to how close to the optical axis the requisite convexity or concavity must be" and that a POSITA would have an "infinite number of potentially plausible options to choose from." (Shanley Decl. at 6, 7.)  But, regardless of where one could draw the outer bounds of this portion, there is one point on the surface that must be in this portion—the point at which the surface intersects the optical axis.  If the portion did not contain this point, it would be improper to describe it as *the* portion of

---

[2] Largan argues that Dr. Shanley's opinion is not reliable and should be excluded under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  (*See* Largan Br. at 11–15.)  To the extent the Court considers these objections, it finds that they go to the weight of Dr. Shanley's conclusions, as the need for exclusion under *Daubert* is lessened in claim construction, because "any potential prejudice or confusion is neutralized when the Court serves as the factfinder."  *Altera Corp. v. PACT XPP Techs., AG*, No. 14-CV-02868-JD, 2015 WL 4999952, at *15 n.13 (N.D. Cal. Aug. 21, 2015).

United States District Court
Northern District of California

1    the surface "in proximity to" or "proximate to" the optical axis.  Indeed, when Dr. Shanley

2    describes the "infinite number" of possible ways to define proximity, all of the examples given

3    include the point of intersection with the optical axis.  (*See* Shanley Decl. at 7 (describing region

4    "within a certain absolute distance" from optical axis, or "within certain relative distance based on

5    size of lens element," or a paraxial region which is defined as within a certain angle of incidence

6    from the optical axis.); *see also* Motorola Br. at 10 (same).)

7        Taking these two premises together, it follows that if *the* portion of the surface "in

8    proximity to" or "proximate to" the optical axis is characterized as "convex" or "concave," a

9    POSITA would understand that to mean that that portion is either *wholly* convex or *wholly*

10   concave.  In other words, in order for that portion of the surface to be characterized as "convex" or

11   "concave," every point in that portion—*including the point where the surface intersects the*

12   *optical axis*—must be convex or concave.  It therefore does not matter where a POSITA would be

13   able to draw the outer bound of what is "proximate to" or "in proximity to" because, regardless of

14   where that boundary is drawn, the definition collapses back down to defining convexity or

15   concavity in reference to the one point that must necessarily be in the portion—the point at which

16   the surface intersects the optical axis.  In light of this, a POSITA would understand that, in order

17   to determine whether a portion of a lens surface "proximate to" or "in proximity" to the optical

18   axis was convex or concave, one would look to convexity or concavity of the surface at the point

19   at which the surface intersects the optical axis.  This is sufficient to provide "reasonable certainty

20   to a skilled artisan when read in the context of the patent."  *Mentor Graphics Corp. v. EVE-USA,*

21   *Inc.*, 851 F.3d 1275, 1290 (Fed. Cir. 2017).

22       When construing nearly identical terms, the court in *Largan Precision Co. v. Genius*

23   *Electronic Optical Co. ("Genius")*, No. 13-cv-02502-JD, 2014 WL 5358426 (N.D. Cal. Oct. 20,

24   2014) came to a similar conclusion.  There, the patent challenger did not argue that the patentee

25   acted as its own lexicographer, but did make a similar argument that defining concavity or

26   convexity of a lens surface by reference to a portion of the surface "proximate to" or "near" the

27   optical axis was indefinite.  The court there rejected that argument, finding that a POSITA would

28   understand that the use of those terms "simply recognizes that the notion of curvature at a point

United States District Court
Northern District of California

9

refers to the curvature infinitesimally close to the point" and that "[i]n the real world, this means measuring the curvature as close to the optical axis as possible."  2014 WL 5358426, at *8.  While this Court is cognizant that Motorola was not a party to that action such that collateral estoppel would apply, it nonetheless finds persuasive the *Genius* court's conclusion, which construed the same terms in related patents.  *See Finjan, Inc. v. Symantec Corp.*, No. 14-CV-02998-HSG, 2017 WL 550453, at *3 (N.D. Cal. Feb. 10, 2017) ("When engaging in claim construction, district courts have granted 'reasoned deference' to claim construction orders outside their jurisdiction that address the same term in the same patent, given the importance of uniformity in claim construction.").

For the foregoing reasons, the Court adopts the construction: "surface that is convex/concave where the surface intersects the optical axis."

**2.**   **"a fifth lens element with positive refractive power having a convex image-side surface, and at least one of an object-side surface and the image-side surface thereof being aspheric" ('767 Patent, claim 16)**

| Largan's Proposed Construction | Motorola's Proposed Construction |
|---|---|
| No construction necessary, plain and ordinary meaning | "a fifth lens element with positive refractive power having a convex image-side surface, a <u>concave object-side surface</u>, and at least one of an object-side surface and the image-side surface thereof being aspheric" |

The term "a fifth lens element with positive refractive power having a convex image-side surface, and at least one of an object-side surface and the image-side surface thereof being aspheric" appears in independent claims 1 and 16 of the '767 patent.  ('767 Patent cl. 1, 16.)  The parties dispute whether the Court should construe this term to limit the scope of the claimed invention to require the fifth lens element have a "concave object-side surface."  Largan argues that importing such a limitation is improper, while Motorola argues that the '767 Patent only discloses and enables lens assemblies having a fifth lens element with a concave object-side surface, and therefore it is proper to limit the claim language to only those embodiments actually disclosed and enabled by the specification.  (*See* Largan Br. at 18–19; Motorola Br. at 19–22.)

United States District Court
Northern District of California

1   The Federal Circuit has "repeatedly warned against" importing limitations from the

2   specification in the claims. *See Phillips*, 415 F.3d at 1323. "[A]lthough the specification often

3   describes very specific embodiments of the invention," it would be improper for the court to

4   "confin[e] the claims to those embodiments." *Id.* Here, Motorola's proposed construction asks

5   this Court to do precisely what the Federal Circuit has "repeatedly warned" against, by importing a

6   limitation from embodiments disclosed into the specification that is found nowhere in the claim

7   language. The Court will not do so.

8   Motorola's arguments do not persuade. First, the cases cited by Motorola in its briefing

9   are inapposite. For example, Motorola relies on *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315,

10   1320-21 (Fed. Cir. 2017), but that case did not resolve a question of claim construction. Rather,

11   the question in that case was whether the patent's specification contained sufficient written

12   description of the claim under 35 U.S.C. § 112. Thus, when the *Rivera* court concluded that a

13   broader interpretation of the word "pod" was inappropriate given the narrow embodiments

14   disclosed in the specification, it was interpreting the scope of that word in terms of what the

15   *specification provided written description for*, not what the scope of the claim was. *See id.*

16   Indeed, the word "pod" did not even appear in the claim language, meaning the court could not

17   have been engaging in any form of claim construction. *See id.* at 1317. Similarly, *Gamevice, Inc.*

18   *v. Nintendo Co.*, 661 F. Supp. 3d 971, 979 (N.D. Cal.), *on reconsideration*, 677 F. Supp. 3d 1069

19   (N.D. Cal. 2023) also involved questions as to the scope of written description, and not claim

20   construction. Plainly, such cases are inapplicable here, and provide the Court with no reason to

21   import limitations from the Asserted Patent's specification into the claim language.

22   Motorola's additional authorities, cited in its claim construction demonstratives, fair little

23   better. In *Abbott*, the Federal Circuit construed the term "electrochemical sensor" narrowly as

24   sensors without external cables and wires, because the patent's specification " 'repeatedly,

25   consistently, and exclusively' depict an electrochemical sensor without external cables or wires

26   while simultaneously disparaging sensors with external cables or wires." 696 F.3d at 1150

27   (quoting *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004)). In

28   *Groove Digital, Inc. v. United Bank*, 825 F. App'x 852, 857 (Fed. Cir. 2020), the Federal Circuit

United States District Court
Northern District of California

1    similarly affirmed a construction of the term "applet" to require geotargeting, because "in every

2    pertinent embodiment disclosed in the specification, applets are served based on geotargeted

3    specifications." *Id.*

4          Notably, in both these cases, the court found that the patentee acted as a lexicographer by

5    defining the relevant claim terms by implication.  *See Abbott*, 696 F.3d 1148–50 (A patent's

6    specification "may define claim terms by implication such that the meaning may be found in or

7    ascertained by a reading of the patent documents." (citation omitted); *Groove Digital*, 825 F.

8    App'x at 856 (same).  In contrast, Motorola's position as to this claim term does not argue

9    lexicography by implication, as there is no term that it is arguing has been "redefined."  It is

10   implausible to suggest that the entire phrase "a fifth lens element with positive refractive power

11   having a convex image-side surface, and at least one of an object-side surface and the image-side

12   surface thereof being aspheric" was redefined by the patentee "by implication," like the terms

13   "electrochemical sensor" or "applet" in *Abbott* and *Groove Digital*.  Nor is it plausible that "lens

14   element" could be so defined, as Motorola's proposed construction only applies to the fifth lens

15   element, and other lens elements in the claim indisputably do not have a concave object side

16   surface.  This is not the case where an ambiguous term in the claim language is implicitly defined

17   to require a specific feature or limitation because the embodiments "repeatedly, consistently, and

18   exclusively" depict it as such.  Instead, Motorola's proposal plainly seeks to confine the claims to

19   those embodiments disclosed in the specification, and asks the Court to commit the " 'cardinal sin'

20   of claim construction by importing limitations from the written description into the claims."

21   *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).

22         Nor is the Court convinced by Motorola's argument that Largan's proposed construction

23   would contradict the primary purpose of the claimed invention.  Even if the Court were to credit

24   Motorola's assertion that the primary purpose of the claimed invention here was reduction of total

25   track length, nothing in the Asserted Patents suggests that track length reduction is the *only*

26   purpose of the claimed invention, such that any construction of the claim term that allows for any

27   increase in track length must be discarded.  This stands in stark contrast to cases such as *Abbott*,

28   where the specification actively disparaged electrochemical sensors with external cables and

wires. Here, there is no statement in the specification disparaging embodiments inconsistent with Motorola's proposed construction. At most, such an embodiment inconsistent with Motorola's proposed construction would be marginally less optimal in reducing track length, but there is no evidence here that the Asserted Patents seek to claim only the *most optimal* embodiment of the patented invention.

For the foregoing reasons, the Court finds that this term needs no construction.

**IT IS SO ORDERED**.

Dated: May 7, 2024

_____
JEFFREY S. WHITE
United States District Judge